The United States Bankruptcy Appellate Panel for the 8th Circuit is now in session. All persons having business before this honorable court may now draw near and they will be heard. God save the United States and this honorable court. The first case for hearing this morning, July 9th, 2020, is case number 20-6005, N. Ray Van Steele Foundry Corporation, Daniel Dooley, etc. v. Luxfer MEL Technologies. All right, good morning, counsel. This is Judge Saladino and I'm joined today by Judges Schirmer and Sandberg. And we're here at the 8th Circuit Bankruptcy Appellate Panel, so just welcoming you to oral argument. And why don't we start with the appellant. Is it Mr. Schottenstein? Yes, sir. Noah Schottenstein for the appellant, Luxfer. All right. You're up, sir. Thank you, Your Honor. And good morning to the panel. For nearly 30 years, the 8th Circuit has made it clear that in evaluating the parties' subjective ordinary course of business, there is no precise legal test and that courts should instead apply a fact-intensive analysis. Accordingly, although many cases turn on the timing of certain payments, that does not mean it is the only factor that courts should consider. The 8th Circuit has repeatedly explained that the analysis is open-ended in the nature of a totality-of-the-circumstances test. For example, in the Leavitt case, the 8th Circuit reversed the bankruptcy court determination that payments were not in the ordinary course when there was no evidence of the departure from, quote, normal operations other than a 10-day difference in the days-to-pay analysis between the pre-preference and preference period. In the Armstrong case, the 8th Circuit directed bankruptcy courts to be cognizant of the policy background in evaluating whether payments are in the ordinary course. In the Affiliated Foods case, the 8th Circuit stated that the creditors' willingness to tolerate delays in the pre-preference period should not be held against it in evaluating whether the challenged payments were ordinary course because that willingness was consistent with the purpose of the bankruptcy code to encourage creditors to work with troubled businesses and there was no evidence of other unusual activity in that case. In the Spirit Holding and AgriProcessors cases, lateness was not even an issue. Both of those cases concerned even bankruptcy changes in payment methods, among other qualitative factors, including whether the creditor deviated from its standard operating policies when dealing with the debtor. And although the 8th Circuit has not explicitly endorsed it, this court has recognized the four-factor sliding-scale analysis that is commonly used in other circuits. Here, despite nominally following this authority, the bankruptcy court below was way out in left field. This appears to be the result of the bankruptcy court's summary adoption of the trustee's analysis. In doing so, the bankruptcy court also adopted the patent errors in the trustee's analysis. As the trustee testified at trial, his analysis excluded all factors except for the relative lateness of certain payments, stating that his method was, quote, all math and that external factors were totally irrelevant. The bankruptcy court's decision further echoed this sentiment, stating that the ordinary course of the party's dealings can be based upon the average time between the invoice date and payment during the pre- and post-preference period, and specifically deeming Luxor's change in payment terms during the pre-preference period as irrelevant to the ordinary course of business analysis. By refusing to consider external facts and circumstances as relevant to the analysis, the bankruptcy court has transformed a multi-factor, subjective test into an objective, single-factor calculation. Under this reasoning, Mr. Konstein? Yes. This is Judge Salazar. Yes, sir. So you mentioned the change in payment terms. Once we're already dealing with a debtor whose payments were always paid late, why do the payment terms matter at all? If the payments were always late, isn't it a matter of how late are the payments? It absolutely matters here, Your Honor, because the change here occurred as a part of Luxor's annual re-evaluation process. During the pre-preference period, the debtor went from paying on net 30 to net 45. So if you are evaluating this based on— But the debtor never paid according to net 30 terms. The debtor always paid something after that. Right. But the debtor also is consistent in the late net after net. So if you look at the post-net payment pattern here, the debtor—and this is on the transcript, we mentioned in our briefing as well—there's no dispute. The debtor always paid 13 days post-terms in the pre-preference period and paid 15 days post-terms in the preference period. And this is an essentially identical period of delay post the deadline. And so this might— Debtor—sorry, Judge Scharmer? Mr. Schottenstein, this is Judge Scharmer. In your client's baseline period—or did your client's baseline period run from—run some 15 months from April of 2015 through July of 2016? July. I don't have the—I remember that the baseline period here, there was a dispute below over when it started because it was not immediately following the—there was a gap between the actual bankruptcy and when it started. But I believe the period got three to four years. Did your baseline period include 45 days of the preference period? Well, I don't have that date right in front of me. If your baseline period did include the preference period, how can that comparison be made? Well, it is my understanding that the way that this worked here was that there was a look at the preference period itself and then a short gap and then it went back, I believe, three to four years. And so, that's how the comparison was made between the pre-preference period and the preference period itself. Well, do you think the following sentence in the order from which you're appealing is clearly erroneous? Luxfer's suggested baseline includes data from 15 months from April 2015 through July 2016, which does not include the entire preference period, meaning that it includes some of the preference period on my calculation, 45 days. Do you think that is clearly erroneous? I can't say you're on there without further looking at it. To my recollection, that does sound correct about how the preference period was established here. Thank you. And so, under the Bankruptcy Court's reasoning, you would never need a trial to determine the party's subjective ordinary course of business. The only facts that matter are the invoice dates and payment dates, which are typically undisputed, and the judge only needs to calculate whether the timing of the challenged payments deviates from the average by some arbitrary figure. Put otherwise, the Bankruptcy Court effectively created a precise legal test and Eighth Circuit law states that there is no precise legal test. The impact of this error materially changed the outcome of the case below by excluding uncontested facts from the analysis that the Eighth Circuit and this court consider relevant, if not fundamental, when evaluating the party's subjective ordinary course of business. In the Laclede Steel case, doesn't the Eighth Circuit identify four factors which the courts can consider? Yes, Your Honor. In the Laclede Steel case, the court identifies the four typical factors, I believe, is the precise language that the court used. One of those is the mathematical computation. But which of the four is your client hanging his hat on? Let me review them with you. The length of time the parties were engaged in the transactions at issue, that's the mathematical component. Whether the amount or form of tender differed from past practices. Three, whether the debtor or creditor engaged in any unusual collection activity, you've said that wasn't the case in your brief. Whether the creditor took advantage of the debtor's deteriorating financial condition. So if we don't use the mathematical computation, which of the other three are you hanging your hat on? It's the second factor, Your Honor. Because, again, the form of the tender here, the debtor, again, if you account for the change of terms, which we believe the court, which we believe is relevant to determining the party's subjective ordinary course of business, the debtor always paid late from whatever that net term was. Typically, it was 14 days before the preference period and 15 days within the preference period. And so that form, that's a consistent practice. The cornerstone of the test is to determine whether the practices were consistent between the preference period and the pre-preference period and that a debtor's consistent practice of paying 13 to 15 days after the due date is evidence of that consistency and should be considered in determining whether, in fact, there is a payment out of the ordinary course of business. Counsel, this is Judge Sandberg. So what your argument is, is that the use of the invoice date is not appropriate. Rather, the court needs to look at the lateness date, if you will, the due date that the parties have established. Is that what your argument is? Yes, Your Honor. During the preference period, the parties established, effectively, a new ordinary course of business. And in preparing for argument today, we came across a previous opinion we are not aware of, again, that does stand for the proposition that when the parties establish a new ordinary course of business during the preference period, that should be respected. After argument today, we will be submitting a copy of that to the court for consideration. But yes, this factor is relevant to the ordinary course of business analysis. The fact that the bankruptcy court refused to consider this is legal error. It was a misapplication of the text. Excuse me, Judge, may I interrupt just one minute? This is Cindy Harrison and Mr. Schottenstein. You are entering into your rebuttal time. Thank you. So I have two questions with regard to the use of the invoice date and the due date change. I mean, can't a creditor manipulate the debtor by changing the due date in order to make any payments that come in as they are coming in later and later, change the due date just in order to avoid a preference? Well, Your Honor, the trustee, the analysis adopted by the bankruptcy court was all math. And instead of using the all math approach, the court applies to the circuit as that is a fact-intensive analysis. If a judge sees a pattern of this, the judge can do something about it. I think that's completely within the purpose of the test is to actually look at what's going on on the ground here and not leave it up to the purely analytical quantitative payment date analysis. That's not what the circuit has directed courts to consider. And so those concerns fall away because the judges are capable of handling the situation. There's no dispute over the baseline calculation here. We're not challenging that at all. We're simply challenging the use of the all math test and I'll reserve the remainder of my time. Thank you. Okay. Thank you. All right. So Ms. Stanger for the affiliate. Good morning, Your Honors. May it please the court? This is Christina Stanger. I'm at the Nye Master Good law firm in Des Moines, Iowa. Can you hear me okay? We can hear you just fine. Great. This is a little different for us. I'm counsel to Daniel Dooley, the trustee to the WDC Liquidation Trust, the Wellman Dynamics Corporation debtor. And Daniel Dooley is asking this court to affirm the bankruptcy court's decision in this case for the number of reasons set forth in the brief and primarily because when looking through the standard of review, the lens of clearly erroneous, the bankruptcy court got it right here. And there's plenty of material in the record to support that decision. Your Honors have raised some great points in the questions. I'd like to start with those and then move to really what I've outlined as three issues, the standard of review, whether or not defendants sustain their burden. And then finally, the court applied the right approach here. I'll start with, I guess, the inquiry that came up on the appellant's argument. Judge Saladino, your analysis here or I guess articulation that if the payment terms were always late, does it really matter? That's exactly the conclusion that was reached when looking at the relationship and how the parties did business here. Dan Dooley and the court spent over seven hours of testimony, 33 exhibits, and two really competent witnesses who had been involved in the case for almost now four years. There was a detailed discussion about the party's relationship. And as the affiliated groups teach to set forth and love it and gateway and everything the approach we've used in the Eighth Circuit for years, the court applied a peculiarly factual analysis. Look at what was ordinary in the business of these two parties. It is not a... Ms. Fanger, this is Judge Shermer. During your baseline period, it seems that the average was payment within 43 days of date of invoice, correct? That's correct, Your Honor. And then is it your client's position that during the preference period that anything after 47 days should be determined not in the ordinary course? Your Honor, Mr. Dooley did a number of ranges in his schedules to provide essentially the benefit of the doubt to the debtor. Anything that was, you know, to account for those outliers that we see in some of those range methods or some of the other methodologies. You see, the answer, Your Honor, is anything that is more or less than 17 days out of, yes, out of the ordinary, was out of the ordinary. Anything different than those payments. The trial court attributed to your client the conclusion that 47 days was the cleavage between ordinary course and not ordinary course. Was that clearly erroneous? No, Your Honor. That is a reasonable evaluation of the facts here. It provides an 80... And then in footnote one, apparently 47 means 52. Your Honor, I appreciate that and looked at that a little bit closer actually this morning as well. That was just to account for the difference in some of the dates in the numbers of the versus 52, which is when the Luxfer folks recorded it on their account. I think that was the court's attempt to just ensure that the numbers were validated with the analysis. I do not see that as clearly erroneous, Your Honor. There was... There were ample evidence in the record to support the conclusion here that 40 percent... There was an increase in payment difference. There was a difference of ordinary business between the parties at a 40 percent rate. That's using 60 days, not 47 and not 51, but using 60 days. My question to you is, if we use the 47 that Mr. Dooley suggests as the cleavage point, what do you think of the Spanner Sausage case that said we're skeptical that five-day difference in the average invoice age is substantial enough? Your Honor, I'm sorry, I'm not familiar with the case, but if I think I understand your question, that holding provides that a five-day difference is substantial or is not? I couldn't hear that part. Is not. And so we have a four-day difference. Your Honor, here, I believe the ordinary course period between 47 days and the preference period payment, which is 63 days, creates a 16-day difference, more of a 34 percent change. So I think that 16-day difference is more like the Gateway case as opposed to the case Your Honor cited. Thank you. I would really look at the determination of the facts and the methodology that the court uses. Our, the Eighth Circuit has identified that that's clearly within the discretion of the bankruptcy court who's sorting through, marshaling the evidence, you know, reviewing all of these schedules. I mean, the data is six ways from Sunday in these cases, and it's so peculiarly factually driven that a lot of these cases don't go to trial because it really turns on every specific fact or the different way you might analyze the data. The court— Ms. Stanger, this is Judge Schirmer again. The court adopted the, your client's position of 47 days, four days after, or four days longer than the baseline period. And I wonder what basis the court used to adopt that position other than the one sentence, D's analysis provides a balanced approach to establish the ordinary course of business at 47 days. What analysis did the court use? Well, Your Honor, I would submit that the court listened to over seven hours of testimony, reviewed all of the schedules, listened to the ordinary business between the parties, evaluated the financial capabilities of the debtors in the year before the bankruptcy and the three years before in making each of these findings to determine what was appropriate. And I would submit, Your Honor, that the court's weighing of the credibility of the data and the evidence was not clearly erroneous here. I think that when we look at— Ms. Stanger— You and I know— Excuse me. Ms. Stanger, this is Judge Saladino. So, am I correct that in the preference period, none of the payments were made within the adopted or were some— Let me look at schedule, I think 6H or 6— And the reason I'm asking that is I'm wondering if each payment needed to be looked at instead of looking at, okay, during the preference period, 27 payments were made and they averaged this one in saying this one was so many days late, was that one outside the ordinary course? In other words, look at them one by one. Should the bankruptcy debtor look at them one by one? I guess that's the best way I can word the question. One moment, Your Honor. I think— Your Honor, when I look at Exhibit B, 6B from Mr. Dooley's schedule, I do see that the payment and provides us the windows of time for payment. And it's my understanding as I look at the exhibits and the record below that all of those payments exceeded the 47-day mark. And so, I believe that the court's analysis does account for that approach. And the court did not create an error or a mistake in determining that all of those preference payments were outside of the ordinary course. I think while what we heard at the trial court level was the defendant trying to excuse those extended payments, you know, beyond the 15 days based on these payment terms, the net dates, right, that's where the analysis came into play as to, well, that 15 days late, everything past 47 days is because, like Judge Sandberg identified, frankly, Luxford manipulated their terms in order to make sure that the debtor wasn't too far late. So, in looking at the evidence below, the data does actually demonstrate every single one of those payments in the preference window were outside of the 47-day ordinary course. And the court below did not make a mistake or commit clear error there. And I noticed, Your Honors, that the parties do have a difference of opinion about what the standard of review should be here. And I did want to just identify that under our case authority here in the Eighth Circuit, any analysis of 547C2 and the interpretations thereof as to whether a payment's made in the ordinary course is a factual analysis and is not set aside unless it's clearly erroneous. I don't think this is a de novo review from the court, and we should give due regard to the court to judge the credibility of the witnesses. I want to highlight the U.S. Bank case that was not excluded by Mr. Dooley or my voicing on purpose. I just want to ensure that that is addressed. The U.S. Bank Supreme Court case, you know, sets out those standards for when de novo and when a clearly erroneous approach should be used. And in that case, the court did apply clearly erroneous because it was a factual analysis, another matter where factual analysis is so critical when you're looking at the insider status. Just like here, we have a clearly erroneous standard. Your Honors, I'd like to move to this argument where the court, Lexler believes that the court and Mr. Dooley found, you know, every other factor was irrelevant. That's just not what the record displays. He takes the briefing, and my appellant colleague takes the statement on page four in the last paragraph out of context, the rest of the case and the rest of the analysis. The court clearly had a very intense review of this case, and so did Mr. Dooley. You can look in his testimony. He lived with this case for three and a half years. He very carefully tried to determine the correct baseline here. And Judge Soledino, excuse me, Judge Shermer, you're correct. The baseline that the debtor or that the appellant wanted to use includes a portion of the preference period. And of course, they want to use the preference or the baseline that starts when they change the terms. The changing the terms didn't start five months before the bankruptcy. It started in April 2015. The record reflects that, and the appeal brief actually says it's five months. It's actually a year and 15 months before the bankruptcy. But to your point, Judge Shermer, the bankruptcy court's sentence on the top of page four, where she notes that the period the baseline suggests by Luxford goes through July 2016, you know, whether that's clearly erroneous. I would submit, Your Honor, that it is not. She evaluated what she believed was their position here. But then in evaluating all of the facts involved, you know, the payment terms, the method of business between the parties, the court looked at all of and heard evidence of all of the Laclede factors. And by the way, Laclede was mentioned in a footnote saying our circuit actually doesn't apply to this. These are things the court may look at. But we apply a multitude of factors, and just like Your Honor said, when none of those other factors exist, just like in this case, then the payment terms... Excuse me, counsel, but you have reached your two-minute warning. Thank you, Ms. Harrison. So I would submit, Your Honor, Judge Shermer, you're correct, where the appellant's baseline creates clear error because they include the preference period. But Judge Chodine's approach on the baseline accounted for all of these peculiar facts and the relationships between the parties. They did business for 40 years. This is a critical supplier who was willing to continue to work with the debtor. Yes, we acknowledge that. This was one of the best committee chair members I've ever had in my career. They were outstanding. The facts remain, though, that 547C2 protects all creditors, not just the essential ones who manipulate terms, who pick and choose their baseline date. The trustee had to take care of... Ms. Stenger just said, how are you saying they manipulated terms when it was done 15 months before the bankruptcy filing? Yes, Your Honor. They, as the testimony below record revealed, they were doing that in order to not follow their procedures internally to pull the trigger, essentially, to initiate collection actions. So knowing that their debtor always paid late and they were getting later and later and later as the year was coming in, as the debtor was coming into a financial distress, that's what they were doing, just as Judge Sandberg identified. This debtor was in financial distress the entire year before the bankruptcy. That's what the duly and the court were... Excuse me, counsel. Your time is up. Thank you, Your Honor. Thank you, Ms. Harrison. We respectfully request the court affirm the bankruptcy court's decision. Mr. Schattenstein, you are seeing you have one minute and 14 seconds left. All right. Thank you. I'll try to be quick. First, Mr. Schattenstein, this is Judge Schermer. Did your client use the or advocate the total range method? Yes. Has that method ever been adopted by any Eighth Circuit opinion? I do not believe it has ever been adopted by an Eighth Circuit opinion, Your Honor. Thank you. I also am not aware of it being foreclosed. Sorry about that. I accidentally cut myself off the phone. So we're back to Mr. Schattenstein, right? Yes. First, I just want to point out, Judge Schermer is right. There's no independent analysis from the bankruptcy judge here. She incorporated Dooling's approach, and I would direct the court to pages 94 and 95 of the transcript, where it says that, again, the trustee's approach excludes all the stuff. The only reason those facts were before the bankruptcy court was because Luxburg put those facts and evidence consistent with the four-factor test and, again, the fact and sense of analysis. In this case, I can only assume the state is referring to is all of the different invoices. Everything else is patently inconsistent with the record here. Similarly, the trustee is the only one who testified at trial. Excuse me. Whatever she's talking about manipulating, there are no findings on that point. There's nothing in the record to support that. Excuse me, Mr. Schattenstein, your time is up. Okay. All right. Well, thank you both. This hearing is adjourned, and, judges, I think you have the call-in number for us to call. Okay. Court will be in recess until further notice. Thank you. Thank you, Your Honor. Thank you, Your Honor.